IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GENEVA TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09-cv-867-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Geneva Turner brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff filed for disability insurance benefits and supplemental security income on July 26, 2006, alleging disability due to shoulder injuries, diabetes, tendonitis, and bursitis. Plaintiff explains on her disability report that she is limited to lifting no more than 5 pounds, her "hands get numb a lot," and she has "chronic daily pain." (R. 130). Plaintiff's alleged onset date is June 2, 2006; she reports that she quit work because of her health conditions

(R. 130), specifically her "severe pain" (R. 172).  On her disability report on appeal, plaintiff explained that her condition has gotten worse – she stated that her pain is increasing, she is unable to get adequate treatment, and she is very depressed because of her situation. (R. 165).  Plaintiff further reports that she has new illnesses, injuries, or conditions of depression and elevated blood pressure due to her "uncontrolled pain."  (Id.).

Plaintiff injured her right shoulder on the job while working at Tyson Farms in 2004.[1] Dr. Fred Flandry treated plaintiff for her injury and, on October 19, 2004, diagnosed probable SLAP tear in the right shoulder; adhesive capsulitis; acromioclavicular joint arthritis with distal clavicle impingement; and rotator cuff tendinitis.  (R. 251).  Dr. Flandry ordered an MRI, and told plaintiff to remain on her current work restrictions: "light duty, sedentary activities only, and lifting less than 10 pounds, and no overhead lifting."[2]  (R. 252).  On October 23, 2004, the MRI was performed (R. 250), and on November 16, 2004,  Dr. Flandry reported that the MRI was not conclusive; he prescribed intense outpatient therapy for a month, and if no improvement upon completion of therapy, indicated that he would perform surgery. (R. 249). On December 16, 2004, Dr. Flandry noted that plaintiff failed conservative treatment measures.  His impression was right shoulder pain, failed conservative therapy; slap tear, right shoulder; partial rotator cuff tear; and impingement syndrome.  He scheduled an arthroscopy of the right shoulder with SLAP repair and possible rotator cuff repair and

---

[1]  Plaintiff is left-handed.  (R. 37).

[2]  Plaintiff presented to Dr. Flandry for a second opinion.  Her previous physician started her on some therapy and gave her a cortisone injection, all without relief of her symptoms.  (R. 251).

subacromial decompression (R. 247). Dr. Flandry performed surgery on January, 21, 2005. He found that plaintiff's rotator cuff was intact and there was no evidence of disease or spurring of the acromioclavicular joint or of degenerative changes in the glenohumeral joint. Accordingly, the postoperative diagnosis was "Type 2 SLAP (superior labrum anterior posterior) tear." Dr. Flandry performed surgical arthroscopy of plaintiff's right shoulder with repair of the SLAP lesion. (R. 241-43).

Two weeks after surgery, on February 3, 2005, plaintiff followed up with Dr. Flandry. He observed that plaintiff's portals were well healed, and her neurovascular status was intact. Plaintiff was allowed to work, with the restriction of no use of right arm. (R. 240). At her two-week follow-up, plaintiff reported "increased flare in symptoms of her right shoulder pain." (R. 237). Dr. Flandry noted that this developed secondary to her returning to work with restrictions of sedentary activity and non-use of her right arm. X-rays revealed normal bony alignment and no evidence of fracture or dislocation. Dr. Flandry prescribed anti-inflammatory medication and Vicodin for plaintiff's pain, and restricted her from work completely. (R. 237). On March 3rd, Dr. Flandry ordered physical therapy, and noted that plaintiff continued to have pain and limited range of motion. (R. 235).

Plaintiff received physical therapy at the Advanced Rehab Center from March 7, 2005 to December 8, 2005. When physical therapy began, treatment notes from the Advanced Rehab Center showed a passive range of motion (PROM) of 95 degrees, and a passive external rotation (PER) of 35 degrees. (R. 211). On March 29th, Dr. Flandry noted an "increase [in] her motion activities, currently 140, external rotation 45," and stated plaintiff

could work with no use of the right arm. (R. 234). This was the extent of plaintiff's reported progress, and on August 16, Dr. Flandry noted that plaintiff was not really making any progress – she could not reach overhead much, and she experienced pain in the mid anterior arm. He indicated that he was at a loss to explain this, as her x-ray showed no significant biceps pathology. Dr. Flandry stated that he had been given a job assignment of "grader" for the plaintiff, and that she was capable of doing this work. Accordingly, he released plaintiff for permanent reassignment to the grader position. (R. 226).

On December 8, 2005, Dr. Flandry ordered a Functional Capacity Evaluation (FCE), which was completed by Bob Dykes, a physical therapist at Advanced Rehab Center. Plaintiff reported that she still worked at Tyson, but she was not doing anything overhead or lifting with her right arm. Plaintiff's major complaints were constant right shoulder pain and weakness; she explained that her pain intensity was 8 of 10 at worst and 2 of 10 at best. (R. 186). Mr. Dykes recorded plaintiff's right shoulder range of motion as follows: "forward flexion 100 degrees actively (120 degrees passively), extension 40 degrees actively (50 degrees passively), abduction 82 degrees actively (105 passively), internal rotation 45 active, external rotation 45 degrees active." (R. 187). For strength, a manual muscle test revealed a 5/5, grossly, for bilateral upper extremities, with the exception of her right shoulder which was rated a 3+/5. Plaintiff complained of tenderness along her anterior/superior biceps, and posterior right shoulder. Mr. Dykes noted that plaintiff exhibited inappropriate symptoms – she constantly guarded her right upper extremity, and she consistently reported her pain in the 5-8 range (very severe pain) but was able to carry on normal conversation. He further noted inconsistencies in performance – plaintiff's right pinch measurements were higher than

her full grip measurements, and her single carry for left extremity was greater than her bilateral upper extremity carry.  (R. 187).  Mr. Dykes opined that plaintiff "was not always willing/able to go to the next higher weight or complete the test" and he reported "signs of self-limiting behavior and submaximal effort."  (Id.).  He summarized the results as follows:

> Deficits found in the musculoskeletal evaluation were pain and an inability to perform overhead/over shoulder lifting tasks or repetitive movements, and loss of active range of motion for right shoulder forward flexion and abduction. . . . Her ROM measurements were consistent with multiple tests, however, I feel as though she did not give maximum effort on some of the material handling tests.  Specific grip tests, and UE lifts do not correlate.

(R. 188).  The FCE revealed that plaintiff can frequently sit, stand, walk, balance, kneel, squat, trunk bend and twist, and reach overhead and forward with her left upper extremity; occasionally climb stairs or step ladders; seldom crawl, or reach overhead or forward with her right upper extremity; from floor to knuckle, frequently lift 5 pounds, and occasionally 10 pounds; frequently push and pull 35 pounds, and occasionally 70 pounds; frequently carry, with two hands, 2.5 pounds, and occasionally 5 pounds; frequently carry, with her right arm, 7.5 pounds, and occasionally 15 pounds; occasionally carry, with her left arm, 5 pounds,[3] and occasionally lift, from knuckles to shoulder and floor to shoulder, 5 pounds. (R. 189).  However, Mr. Dykes stated, "The results of this evaluation indicate that [plaintiff's] FCE test does not represent her maximum physical capacities and cannot be used for matching her abilities with her job requirements."  (R. 188).

Plaintiff followed up with Dr. Flandry on January 1, 2006. He stated that plaintiff's "performance on the FCE was suboptimal and inconsistent." (R. 223).  He noted that plaintiff

---

[3] Plaintiff "could not perform" the single left arm carry.  (R. 189).

still had not regained her motion, she refused to have any manipulation done or further therapy, she had refused his recommendations "since last September," and she seemed to have no interest in further attempts to try to improve her situation. Dr. Flandry indicated that he had spoken with "Sheila" at the Tyson plant who reported that plaintiff was able to do her current job without difficulty and was putting in 40 hours a week. Dr. Flandry explained that he "would thus consider [plaintiff] at [maximum medical improvement] with current permanent limitations to what she was able to perform on the FCE." He noted, however, that he thought her potential is probably greater than shown. (Id.). He ordered an impairment rating, which was conducted by Mr. Dykes. (R. 223). Mr. Dykes wrote a letter to Dr. Flandry on February 13, 2006, stating that he assigned an impairment rating to plaintiff of 14% for the right upper extremity and 8% for her whole person. (R. 185)(citing AMA Guides to the Evaluation of Permanent Impairment, pp. 439, 475-80).

Plaintiff received treatment for her diabetes from Dr. Brian D. Raymaker and nurse practitioner Katie Rosenhagen at the Dawson Medical Center from March 30, 2006 through May 23, 2006.[4] On March 30th, plaintiff reported that she had been out of her diabetes medication for the previous three or four months. Nurse Rosenhagen and Dr. Raymaker initially assessed "Type 2 diabetes, currently uncontrolled secondary to medication noncompliance." (R. 259). Plaintiff's diabetes improved with treatment, and on April 13th, Dr. Raymaker assessed plaintiff with "Type 2 diabetes mellitus, non-insulin requiring, slowly improving control." (R. 257).

---

[4] Nurse Rosenhagen's treatment notes for a January 2006 office visit reflect that plaintiff's diabetes was then managed by Dr. Busman. (R. 262).

On April 18, 2006, plaintiff returned to Dr. Flandry after developing discomfort in her left shoulder, explaining that she had put more reliance on her left upper extremity since going back to work. Plaintiff reported jerking her right arm away from some hot grease splatter at work, which had since caused pain in her right shoulder. Dr. Flandry's exam indicated right shoulder abduction of 60 degrees, external and internal rotation of 30 degrees; tenderness to palpation of the subacromial space, no instability, straight abduction stress and supraspinatus stress of good to normal. Her left shoulder had abduction of 110 degrees, external rotation of 90 degrees, and internal rotation of 30 degrees; no instability, tenderness to palpation in the subacromial space, no impingement signs, and cuff tests were normal. (R. 221). Dr. Flandry assessed "bilateral subacromial bursitis, tendonitis," and injected plaintiff's right shoulder with Xylocaine, Marcaine and Celestone.

In April 2006, Ms. Kim S. Dykes, PT, completed a physical therapy evaluation which revealed that plaintiff had full range of motion in her left shoulder, with 150 degrees abduction and minimal pain. Her right shoulder range of motion was 102 degrees, with 52 degrees abduction and pain. A dynamometer grip test revealed strength of 17 pounds in the left upper extremity and 2 pounds in the right upper extremity. (R. 183).

The last physical therapy progress report is dated May 17, 2006, the day before Dr. Flandry released plaintiff from therapy. Plaintiff's active range of motion was reported as full for her left shoulder and 120 degrees for her right shoulder, with complaints of pain and fatigue with movement/activities. (R. 178). Dr. Flandry released plaintiff from physical therapy to a home program on May 18, 2006, noting that he "consider[ed] her at [maximum

medical improvement] with permanent restrictions per the FCE done in December [2005]."
(R. 219).  Plaintiff stated that she was going to be leaving Tyson and moving to Ozark,
Alabama in a month's time.  Dr. Flandry noted that "[s]he was currently on a permanently
restricted job description under which she is able to function without discomfort and she has
no somatic complaints today."  (Id.).

On January 16, 2007, plaintiff began receiving treatment from Physician's Assistant
Charles David Winfrey at the Newton Family Health Center, where she was treated primarily
for diabetes.  At her initial visit, she stated that she was "having some discomfort in her back
following an accident in July [in which she] slipped down from [the] porch and she struck
her back."  She complained of "intermittent pain" on her left side above the hip, but she had
no radicular pain, a normal gait and full range of motion.  Mr. Winfrey assessed diabetes,
type 1, uncontrolled; hypercholesterolemia; hypertension, well controlled; and chronic low
back pain.  (R. 291).  At her February 19, 2007 follow-up appointment for diabetes and
hypercholesterolemia, plaintiff reported "chronic back and shoulder pain for which
orthopedics is evaluating her"  (R. 289).  Sixteen days later – although his treatment notes
reflect no intervening musculoskeletal or neurological examination or other objective studies
(see R. 287-89) –  Mr. Winfrey completed a Clinical Assessment of Pain Form.  He opined
that plaintiff's "[p]ain is present to such an extent to be distracting to adequate performance
of daily activities."  (R. 274).  He noted that physical activity "[g]reatly increased pain and
to such a degree as to cause distraction from task or total abandonment of task" and that
plaintiff will experience "some side effects" from prescribed medications "but these will be

only mildly troublesome to the patient." (Id.).[5]  At her follow-up appointment two weeks

later, plaintiff complained of mild back and shoulder pain ("2/10"). (R. 288).

Plaintiff was prescribed pain medication twice at Newton Family Health Center for

complaints of back pain, once at her initial visit in January and the second time on April 23,

2007, when plaintiff reported back pain after falling out of the tub the previous month.

(R. 291, 285).  She told the nurse practitioner, Carol Morrison, that the ER had prescribed

Lortab and Anaprox and she wanted refills of these medications.[6]  On examination, Ms.

Morrison noted "very slight tenderness" of the bony processes and paraspinal muscle area

of plaintiff's lumbar spine, but full range of motion of the lumbar spine with very little pain,

2+ deep tendon reflexes bilaterally of the lower extremities, and a negative Babinski sign.

She prescribed Anaprox and Flexeril,[7] and explained to plaintiff that they do not normally

give pain medications without further evaluation.  (R. 285).

Plaintiff's diabetes improved over the course of her treatment at Newton – on

February 19th, Mr. Winfrey noted that plaintiff's blood sugar level had remained in the 150

to 160 range, and he increased her dosage of insulin.  Plaintiff reported then and at her next

appointment that she felt "substantially better" with the insulin.  (R. 287, 289).  Plaintiff

---

[5]  Unlike his treatment notes, the pain form completed by Mr. Winfrey does not bear a physician's signature.  (R. 274; see Exhibit 8F).

[6]  Plaintiff had, thirteen days previously, complained to Dr. Caffey of a recent fall for which she had been prescribed Lortab 5 and Anaprox DS 550; Dr. Caffey had then prescribed Lortab and Naproxen. (R. 280).

[7]  Anaprox DS is a brand name for Naproxen Sodium, a nonsteroidal anti-inflammatory drug; Flexeril is a skeletal muscle relaxant.  Plaintiff requested but did not receive a prescription for Lortab, a narcotic pain medication. See *The Pill Book* (14th ed.), pp. 349, 771-73, 816.

explained at her March 3rd examination that she was having difficulty getting her Actos filled.  Mr. Winfrey noted that he would help her with the program to get her medications at low or no cost; plaintiff was to bring the forms back to him.  (R. 287).  Mr. Winfrey reported on March 21st that plaintiff had responded well to her increased insulin, and assessed plaintiff with "insulin-dependent diabetes mellitus, poor control." (R. 286).  He further noted that plaintiff was going to run out of her medications very quickly – therefore, he asked for a refill under the patient assistance program through Ortho Nordisk.  (Id.).

Plaintiff sought treatment from Dr. Taylor Caffey on March 27 and April 10, 2007.[8] The March 27th treatment notes indicate that plaintiff was there for a "check up," and indicated that plaintiff's blood sugar level was 298.  (R. 281).  On April 10th, plaintiff complained of back and left knee pain due to a recent fall.  Plaintiff's blood sugar level was 198.  In his notes, Dr. Caffey wrote, "Pt. is disabled," referring to a letter from another

_____

[8]  It is not possible to tell from the actual treatment notes in Exhibit 7F that plaintiff saw Dr. Caffey or that the notes are his.  (See R. 280-81).  In a cover letter transmitting the records to the ALJ two days after the administrative hearing, however, plaintiff's counsel represents that the attached notes are those of Dr. Taylor Caffey.  (R. 279).

doctor.[9]  For past medical history, Dr. Caffey (or his intake nurse or assistant) wrote "rotator cuff" left and right.  (R. 280).[10]

Mr. Winfrey examined plaintiff on July 9, 2007, and reported that plaintiff's blood sugars were not controlled.  A foot exam revealed excellent sensation in the foot, but plaintiff said she feels "tingles all the time."  (R. 283).  Mr. Winfrey assessed diabetes, type 1, with diabetic neuropathy.

In a letter dated November 16, 2007, Cathie Arnold, a Senior Rehabilitation Counselor with the Alabama Department of Rehabilitation Services, reported that plaintiff cannot currently perform any type of employment.  Ms. Arnold explained,

> We have been gathering [plaintiff's] medical information from doctors.  After receiving the medical information, it is felt she will have a great deal of difficulty in performing any type of employment due to her Diabetes Mellitus, Type 2, Insulin dependent; diabetic neuropathy; bilateral shoulder pain with motion, which includes chronic pain due to rotator cuff tendon, depressed range of motion, and weakness.  It is further felt that she is dealing with depression due to the pain and discomfort being at such a high level, 9 of 10.

---

[9]  Dr. Caffey refers to a letter from another doctor whose name is largely illegible.  (R. 280). However, plaintiff testified that she had been evaluated by a Dr. Dehaven (R. 31), which appears to match Dr. Caffey's note.  At the administrative hearing, the ALJ listed the exhibits and asked plaintiff's representative whether the record was complete; she responded that, except for treatment notes from "Dr. Winfrey," which would be provided to the ALJ by the end of the day, the record was complete and could be closed.  (R. 27-28). Within two days, she provided records from Mr. Winfrey and Dr. Caffey.  (Exhibits 7F and 8F).  Although plaintiff's attorney later submitted updated treatment notes from Dr. Caffey to the Appeals Council, she did not submit medical records from any other physician.  (R. 292-306).  Plaintiff is "responsible for producing evidence in support of [her] claim."  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)(rejecting plaintiff's contention that the ALJ had an obligation to develop the record for the two-year period following his application for benefits).  At the time plaintiff filed her application, she listed Dr. Flandry, Dr. Raymaker, Hughston Clinic, and Advanced Rehab Center.  (R. 132-34).  The administrative transcript includes medical records from all of these sources.

[10]  As noted above, although he initially suspected a rotator cuff tear, Dr. Flandry found no rotator cuff tear in plaintiff's right shoulder when he performed plaintiff's surgery.  (R. 241-43).  While Dr. Caffey's notes include rotator cuff tear – once on the right (R. 305) and twice bilaterally (R. 280, 304) – in plaintiff's past medical history, the record includes no diagnosis of right rotator cuff tear after plaintiff's surgery, and no diagnosis at all of left rotator cuff tear.

It is not felt Ms. Turner can perform any type of employment currently.

(R. 171).  Ms. Arnold further opined that "it is possible [plaintiff] may improve after extensive treatment for all the above."  (Id.).

The ALJ conducted an administrative hearing on July 7, 2008.  Plaintiff testified that, because of her shoulder pain, she cannot drive, cook, vacuum, bathe, or dress herself, and she drops things.  (R. 31, 33).  She reported that she lives with her sister-in-law, and that her sister-in-law takes care of her.  (R. 39).  She explained that, after her surgery, her right shoulder "froze up" – she cannot raise it over her head.  (R. 31).  Plaintiff described pain in both shoulders, severe pain when she uses her hands and arms; she testified that, at the time of the hearing, she was "hurting so bad . . . [she] [could] hardly see straight."  (R. 32).  When asked to rate her pain on a scale from zero to ten, plaintiff responded that it was more than 10 – "off the scale."  (Id.). She later stated that her pain was "[p]robably around 19, 20" in her left shoulder and "8" in her right.  (R. 41).  She reported taking Tylenol and using pain patches for her pain, and that she has not sought treatment because she did not have the money to go to the doctor and she was told there was no cure for her shoulder so there was no "use of going for that."  (R. 32).  With regard to her diabetes, plaintiff explained that her sugar levels are "way high," and "[t]hey can't get them down."  (R. 34).  She first testified that she was on insulin, and stated, "I'm taking three shots a day."  (R. 34).  However, she later stated that she was not on insulin at the time of the hearing because she did not have the money to get it. When questioned by the ALJ about whether she had tried to get free medication, plaintiff stated that Mr. Winfrey helped her "for awhile," but then she "didn't

have the money to go down there to see him to get it." (R. 40). She further reported that Cathie Arnold with the Alabama Department of Vocational Rehabilitation told her that the department could not help her. (R. 43; see R. 171). Plaintiff's sister-in-law, Kawetha Moore, also testified at the hearing; she confirmed plaintiff's reports regarding her daily activities and pain. (R. 46-47).

A vocational expert testified and listed plaintiff's past relevant work as a poultry eviscerator, light and unskilled; doubler, light and unskilled; and a poultry grader, which was her latest job, light and unskilled. (R. 48-49). The VE testified that, based on Dr. Flandry's comments and the RFC completed by Mr. Dykes in December 2005, plaintiff could not return to any of her past relevant work. As to other jobs in the national economy, he testified that there were some light sedentary jobs, including surveillance monitor, sedentary and unskilled; parking attendant, light and unskilled; and arcade attendant, light and unskilled. (R. 51). The VE further testified that if the ALJ accepted Mr. Winfrey's pain assessment, or plaintiff's and her sister-in-law's testimony, there was no substantial gainful activity plaintiff was capable of performing.

The ALJ rendered a decision on August 21, 2008. He concluded that plaintiff suffered from the severe impairment of: "diabetes mellitus and status post right shoulder SLAP repair and decompression in January, 2005." (R. 12). He found that plaintiff does not have an impairment or combination of impairments which meet or equal the severity of any of the impairments in the "listings." (R. 16). The ALJ assessed plaintiff's residual functional capacity as follows:

> Claimant's specific physical capacities and limitations during the period
> adjudication have been the ability to sit for a total of about 6 hours during an
> 8-hour workday; the ability to stand and/or walk for a total of about 6 hours
> during an 8-hour workday; the ability to frequently lift and/or carry 5 pounds;
> the ability to occasionally lift and/or carry 10 pounds; the ability to frequently
> push and pull 35 pounds; the ability to frequently reach overhead and forward
> with her left upper extremity; the inability to reach overhead and forward with
> her right upper extremity; and the environmental restriction to avoid
> concentrated exposure to hazards such as machinery and heights.

(R. 17).  He further determined that she has "no other postural, manipulative, visual, communicative, or environmental limitations" and that she "has not had work-related mental limitations." (Id.). The ALJ determined that there are a significant number of jobs in the national economy which plaintiff can perform – including parking attendant, arcade attendant, and surveillance system monitor – and, thus, he concluded that the plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff appealed the ALJ's decision to the Appeals Council.  Although she had originally submitted a single-page "unsigned and undated Medical Source Statement purportedly completed by Dr. Caffey on November 27, 2007" for the ALJ's consideration (see R. 18, 277), plaintiff submitted a new medical source statement signed by Dr. Caffey on February 2, 2009 to the Appeals Council (R. 296-97), along with Dr. Caffey's treatment notes for the period from October 2008 to May 2009 (R. 298-306).  The Appeals Council considered this evidence but, on July 17, 2009, denied plaintiff's request for review. (R. 1-5).

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff challenges the Commissioner's decision, arguing that the ALJ's RFC assessment and his decision of "not disabled" are not supported by substantial evidence.[11]

## RFC Assessment

---

[11] On the first page of her brief, under the heading of "Issue No. 2," plaintiff suggests that "clear and significant evidence of Ms. Turner's chronic pain and depression" deprives the ALJ's decision of the support of substantial evidence. (Doc. # 12, p. 1). However, plaintiff did not brief this aspect of the substantial evidence issue, choosing instead to conclude her brief after her arguments regarding "Issue No. 1." (See Doc. # 12, pp. 7-11). She did not identify any particular legal errors with regard to the ALJ's consideration of plaintiff's allegations of pain or depression and, accordingly, the court does not discuss this issue. However, in assessing the record to determine whether the ALJ's decision is supported by substantial evidence, the court has considered plaintiff's subjective testimony regarding her pain and depression, as well as the other medical evidence of record, including the records plaintiff submitted to the Appeals Council ten months after the ALJ issued his decision.

Plaintiff argues that the ALJ's RFC determination is inconsistent with Dr. Caffey's opinion that she "should never perform numerous postural functions such as reaching and stooping," (Doc. # 12, p. 8), and that Dr. Caffey's Medical Source Statement is "the only physician's opinion on work-related functional activity." (Doc. #12, p. 10).  She contends that, since Dr. Caffey's opinion is the only physician's opinion on functional capacity, the ALJ erred by not explaining "[the ALJ's] deletion of the restriction to rarely reach or stoop, in reaching his RFC assessment." (Id.). Plaintiff further argues that the ALJ's RFC assessment is not supported by substantial evidence because "light exertional work requires the ability to use ones arms and hands to grasp and to hold and turn objects" and "also involves some pushing and pulling of arm-hand controls or leg-foot controls." (Doc. # 12, p. 10).  Plaintiff points out that Dr. Flandry – whose opinion was given substantial weight by the ALJ – determined that plaintiff can only seldom perform overhead or forward reaching with her right upper extremity, diagnosed bilateral subacromial bursitis after plaintiff complained of left shoulder pain, and did not treat plaintiff after April 14, 2006. (Id.).

Plaintiff's argument relies, in large part, on misstatements regarding the evidentiary record and the decision:

(1) She contends that Dr. Caffey's opinion is "uncontradicted opinion evidence" because it is the only physician's opinion in the record expressing work-related functional limitations. (Doc. # 12, pp. 10,12)  Plaintiff is incorrect.  There is a Functional Capacity

Evaluation in the record conducted by plaintiff's physical therapist, Mr. Dykes (R. 189-190), which was adopted by Dr. Flandry (R. 219, 223).[12]

(2) Plaintiff also argues that "Dr. Caffey opined that *due to Ms. Turner's diagnosed back and knee pain, bilateral shoulder pain, diabetes mellitus*, she should *never* perform numerous postural functions such as reaching and stooping[,]" (Doc. # 12, p. 8)(emphasis added), and that "the ALJ never mentioned this important function (reaching and/or stooping) in his assessment of RFC." (Id., p. 9). Again, plaintiff is incorrect. Dr. Caffey's opinion was that plaintiff should "rarely" engage in these functions, not that she should "never" do so. (R. 277). Additionally, Dr. Caffey never expressed the opinion that these limitations were "due to" plaintiff's "diagnosed back and knee pain, bilateral shoulder pain, [or] diabetes mellitus." In the medical source statement plaintiff provided to the ALJ, Dr. Caffey gave no explanation at all of the reasons for his assessments of plaintiff's functional capabilities. (See R. 277).[13] Dr. Caffey's treatment notes, which were provided to the ALJ, list plaintiff's

---

[12] Plaintiff appears to recognize that Dr. Flandry also expressed an opinion regarding plaintiff's functional capacity; she observes – immediately following her argument that Dr. Caffey's opinion is the only physician's opinion on work-related functional activity – that Dr. Flandry's assessment included a determination that "Ms. Turner could seldom perform overhead or forward reaching with her right upper extremity." (Doc. # 12, p. 10).

[13] Plaintiff's argument is directed entirely to the ALJ's analysis. However, the court notes that medical source statement plaintiff filed with the Appeals Council contains only slightly more reasoning than the original statement. In the statement before the Appeals Council, Dr. Caffey indicates that plaintiff suffers from bilateral shoulder pain, the underlying condition which causes the pain is "motion," and the objective findings which demonstrate this "condition" -- *i.e.*, "motion" -- are "decreased range of motion & weakness." To a query asking Dr. Caffey to list the "objective evidence of pain" that he observed, Dr. Caffey's responded "pain on motion of upper extremities." (R. 297). Although he imposes dramatic functional restrictions (R. 296), Dr. Caffey rates plaintiff's pain as only "moderate" in severity (R. 297). The objective findings of "decreased range of motion & weakness" indicated on the medical source statement do not appear anywhere in Dr. Caffey's accompanying medical treatment notes. (See R. 298-306, submitted to the Appeals Council, and R. 280-81, submitted to the ALJ). Dr. Caffey's notes for some of plaintiff's office visits include no notations indicating that he performed a physical examination during the visit. (R. 281, 299, 302, 306). For all other visits, Dr. Caffey's notations regarding his findings are minimal. (R. 298, 300, 301, 303, 304,

complaints of back pain, knee pain, and bilateral shoulder pain, and a past medical history of "DM2" and "Rotator cuff" left and right. However, they include no diagnosis by Dr. Caffey, and no association of any diagnosis by any physician with plaintiff's functional limitations. (R. 280-81). Additionally, while the ALJ does not adopt Dr. Caffey's restriction to "rarely" stooping or reaching, he does indeed "mention [the] important function" of reaching. In his RFC assessment, the ALJ concludes that plaintiff has "the ability to frequently reach overhead and forward with her left upper extremity" and that she is unable "to reach overhead and forward with her right upper extremity." (R. 17).

(4) Plaintiff argues that "the ALJ stated that he gave little weight to Dr. Caffey's opinion because he had only seen Ms. Turner on two occasions[,]" citing the ALJ's decision at R. 20. (Doc. # 12, p. 8 and n. 35). The ALJ actually does not mention Dr. Caffey or his opinion on the page cited by plaintiff. The ALJ notes correctly in his summary of the evidence (at R. 15) that plaintiff had then seen Dr. Caffey on only two occasions, but he does not list this among his specified reasons for not according significant evidentiary weight to the medical source statement. The ALJ's reasons are clearly set forth in the decision at R. 18; the ALJ's stated reasons are that the limitations set forth in Dr. Caffey's medical source opinion are "unsupported by the information contained in Dr. Caffey's treatment notes or the records and reports of any other treating medical source," and the opinion form was "unsigned and undated."[14]   (See R. 15, 18).

305).  Most notably, on every instance in which Dr. Caffey indicated an examination of plaintiff's extremities, his notation reads, "No deficit."  (R. 280, 298, 300, 303, 304, 305).

[14]  This latter deficiency was corrected in the medical source statement submitted to the Appeals Council. (R. 297).  The former was not.  (See n. 13, supra).

18

The court's review of the Commissioner's decision on the basis of the actual evidentiary record and the actual rationale articulated by the ALJ's decision -- rather than the "straw man" arguments advanced by the plaintiff -- leads it to the conclusion that the decision is supported by substantial evidence. To the extent that plaintiff contends that the ALJ erred by relying on Dr. Flandry's assessment instead of the opinions of Dr. Caffey, Mr. Winfrey and Ms. Arnold, the argument is without merit.  An ALJ may reject a treating physician's opinion for "good cause," but he must clearly articulate the reasons for his decision.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1991).  "Good cause" has been found to exist where, *inter alia*, the treating physician's opinion is not supported by the evidence and/or is conclusory or inconsistent with his own treatment records. Id.  As noted above, the ALJ clearly articulated his reasons for declining to assign significant evidentiary weight to Dr. Caffey's treatment notes, including the ALJ's conclusion that the limitations set forth in the medical source statement are "unsupported by the information contained in Dr. Caffey's treatment notes" and that they are unsupported by the "records and reports of any other treating medical source." (R. 18).  The medical source statement considered by the ALJ indicated, *inter alia,* that plaintiff can sit for only one hour in an eight hour day, stand or walk for less than one hour, lift five pounds occasionally and one pound frequently, and only rarely engage in particular activities including, as plaintiff notes, stooping and reaching. (R. 277).  The medical record before the ALJ included treatment notes for plaintiff's two office visits to Dr. Caffey. The notes for the first visit do not indicate that Dr. Caffey performed any kind of physical examination; if he did, he failed to include his findings in the

treatment note. (R. 281). Regarding the second visit, Dr. Caffey includes the findings of a physical exam; as to his examination of plaintiff's extremities, he notes "no deficit." (R. 280). Thus, the ALJ did not err in concluding that Dr. Caffey's opinion of severe functional limitations is "unsupported by the information contained in Dr. Caffey's treatment notes."[15]

Plaintiff points to no specific "records and reports of any other treating medical source" to contradict the ALJ's further conclusion that Dr. Caffey's opinion of severe functional limitations is unsupported by the records and reports of other treating sources. Instead, she argues only that "Dr. Caffey's opinion is supported by the opinions of Dr. Charles Winfrey and Cathie Arnold from the Alabama Department of Rehabilitation Services." (Doc. # 12, p. 8). However, the ALJ properly stated his reasons for declining to assign significant weight to PA Winfrey's opinion regarding the level of plaintiff's pain, including the fact that Mr. Winfrey's treatment notes indicate that, on the two occasions in which plaintiff was prescribed pain medication, she related her pain to acute injuries and, further, that the notes do not contain documentation of ongoing pain complaints by plaintiff "certainly not to the extent [PA Winfrey] indicated on the pain form." (R. 17). Plaintiff does not identify any evidence from Mr. Winfrey's treatment records which impeach the ALJ's conclusion.

Mr. Winfrey treated plaintiff almost exclusively for diabetes. (See R. 283, 284, 286, 287, 290). At plaintiff's first visit, she reported "some discomfort in her back" – described as "intermittent" – following a fall from her porch; Mr. Winfrey prescribed pain medication

---

[15] For the reasons stated previously, the new evidence submitted to the Appeals Council provides no basis for overriding the ALJ's determination that Dr. Caffey's opinion regarding plaintiff's functional limitations is not entitled to substantial weight.

but noted "no obvious distress," normal tandem gait, full range of motion of her back, straight leg raises to 90 degrees, and no radicular pain. (R. 291). His treatment note includes a diagnosis of "[c]hronic low back pain" (R. 291), but no diagnosis of any underlying musculoskeletal impairment causing the pain. On February 19, 2007, plaintiff told Mr. Winfrey that she "continues to have chronic back and shoulder pain for which orthopedics is evaluating her" (R. 289) and, on March 1, 2007, she reported back pain at a level of "7/10" (R. 288). The treatment notes for these office visits likewise include no indication that Mr. Winfrey conducted a musculoskeletal examination and no diagnosis of any musculoskeletal impairment. (R. 288-89). Additionally, there is no indication that Mr. Winfrey obtained or reviewed any record of an evaluation with "orthopedics" during that time for plaintiff's complaints of back or shoulder pain. On March 7, 2007, the treatment note references no complaints of pain and, again, includes no indication of a musculoskeletal examination or impairment. (R. 287). That day, Mr. Winfrey completed the pain form. (R. 274). Two weeks later, plaintiff reported back and shoulder pain, but at a level of "2/10." (R. 288). The note for that visit also includes no indication of a musculoskeletal evaluation or diagnosis. (Id.; R. 286).

In summary, plaintiff saw Mr. Winfrey eight times between January and July 2005; his notes reflect a musculoskeletal examination only on plaintiff's first visit, but with no abnormal findings; complaints of pain are noted in only four of those visits, once at a mild level. Additionally, when plaintiff complained of pain to Mr. Winfrey's colleague, nurse practitioner Morrison, the only findings of note upon examination were "slight tenderness

of the bony processes as well as of the paraspinal muscle area" of plaintiff's lumbar spine. Ms. Morrison declined plaintiff's request for narcotic medication, noted full range of motion with very little pain, "no acute distress," negative Babinski, and symmetrical deep tendon reflexes in plaintiff's lower extremities. (R. 285). Ms. Morrison's evaluation of the plaintiff and prescription of Anaprox DS and Flexeril occurred several weeks after Mr. Winfrey completed the clinical assessment of pain form. The ALJ's determination that Mr. Winfrey's opinion is unsupported by his treatment notes is supported by substantial evidence and constitutes good cause for declining to credit the opinion expressed in the pain form.

With regard to Ms. Arnold's opinion that "it is not felt Ms. Turner can perform any type of employment currently" (R. 171), the ALJ explained that Ms. Arnold did not "quantify the factors upon which she based her conclusion," and that the determination of whether plaintiff can work "is an opinion reserved for the Commissioner." (R. 18). Ms. Arnold's opinion is, indeed, conclusory. She reports "gathering [plaintiff's] information from doctors" and states that plaintiff has "bilateral shoulder pain with motion . . . due to rotator cuff tendon, decreased range of motion, and weakness" but does not provide or list the medical records supporting her opinion. As noted previously, plaintiff has no present diagnosis of a rotator cuff tear or, at least, not one that is evidenced in the record. Additionally, as the ALJ notes, Ms. Arnold's opinion that plaintiff cannot "perform any type of employment" goes directly to the ultimate issue reserved for the Commissioner. Even if it came from a medical source, it would not be entitled to treatment as a "medical opinion" under the Commissioner's regulations. See 20 C.F.R. § 404.1527(e). In this case, there is

nothing in the record to suggest that Ms. Arnold is a medical source, treating or otherwise. Rather, it appears that she is a vocational rehabilitation counselor.[16]  She does not indicate which medical records she considered in forming her opinion about plaintiff's employability; her opinion may well be based on the opinions of Dr. Caffey and Mr. Winfrey which the ALJ has discredited.  Even assuming that Ms. Arnold would qualify as a vocational expert, her opinion regarding plaintiff's ability to perform employment is not based on the  RFC assessed by the ALJ and, accordingly, cannot be weighed against Mr. Miller's vocational testimony, upon which the ALJ relied in resolving the issue of plaintiff's ability to do past relevant work or other work.

Plaintiff suggests that the ALJ failed to recognize that Dr. Flandry, plaintiff's treating orthopedic surgeon, diagnosed plaintiff with bilateral subacromial bursitis and tendonitis after she complained of left shoulder pain and that he did not examine the plaintiff after April 18, 2006. (Doc. #12, p. 10).  However, plaintiff's last physical therapy progress note  –  one month after she alleged injury to her left shoulder – reveals a full range of motion in plaintiff's left shoulder and 120 degrees in her right shoulder.  (R. 178).  This examination is consistent with the December 2005 PCE, which revealed a full active range of motion and passive range of motion of 120 degrees in plaintiff's right arm. (R. 187).  Based on this information, as well as his own examination on April 18, 2006, Dr. Flandry – at his last office visit with the plaintiff on May 18, 2006 – expressed his opinion that plaintiff's

---

[16] Her title is Senior Rehabilitation Counselor for Vocational Rehabilitation Service. (R. 171). The vocational expert who testified at the hearing, James Douglas Miller, lists his job title as "Vocational Rehabilitation Counselor."  (R. 92-93).

permanent functional limitations were consistent with the December PCE.[6]   Since Dr. Flandry and Mr. Dykes both believed that the December 2005 PCE did not actually reveal plaintiff's full capacity to work, Dr. Flandry's opinion regarding plaintiff's functional abilities was more restrictive than he actually believed was warranted.  (R.188, 223).  In short, when Dr. Flandry rendered his opinion in May 2006, he was well aware of his own diagnoses of bilateral subacromial bursitis and tendonitis and of plaintiff's subsequent physical therapy; the ALJ did not err by failing to discount Dr. Flandry's May 2006 opinion on the basis of Dr. Flandry's April 2006 diagnoses. Additionally, despite plaintiff's argument to the contrary, the record as a whole does not include objective medical evidence to support a conclusion that plaintiff's condition has deteriorated since Dr. Flandry's May 2006 assessment to the point of rendering her disabled.

Finally, plaintiff correctly notes that the ALJ's RFC assessment does not contain any postural limitation as to "stooping."  Even assuming that this is error, under the particular circumstances of this case, the error is harmless.  After ruling out plaintiff's past work as a poultry grader because he believed that it required bilateral reaching, the vocational expert testified that an individual with the limitations described in the December 2005 PCE could perform the jobs of surveillance system monitor, parking attendant and arcade attendant. (R. 50-52). The three specific jobs identified by the vocational expert do not, as the Commissioner argues (Doc. # 13, p. 14), require stooping.  See *Dictionary of Occupational*

---

[6]  At that visit in May 2006, plaintiff reported that she was leaving Tyson Farms and moving to Alabama. This report contradicts plaintiff's claim that she quit work because of shoulder pain – Dr. Flandry explained that plaintiff was able to perform her permanently restricted job description without discomfort, and she had no somatic complaints that day.  (R. 219).

*Titles*, § 915.473-010 (parking lot attendant)(stooping "not present"), § 342.667-014 (attendant, arcade)(same), and § 379.367-010 (surveillance system monitor)(same). Accordingly, even if the ALJ erred by omitting a limitation regarding stooping, the error did not have any impact on his step five determination that plaintiff can perform "other work" -- *i.e.*, the ALJ's decision that plaintiff is not disabled is still supported by substantial evidence.[7, 8]

The RFC determination is reserved for the ALJ. Green v. Soc. Sec. Admin., 223 Fed. Appx. 915, 923 (11th Cir. 2007). The ALJ did not err by relying on Dr. Flandry's opinion or by failing to credit Dr. Caffey's functional limitations or Mr. Winfrey's pain assessment in plaintiff's RFC; he resolved any inconsistencies by explaining the weight he assigned to the various opinions and the reasons supporting his evaluation of those opinions. Additionally, the ALJ did not err by failing to credit Ms. Arnold's vocational assessment.

## CONCLUSION

---

[7] The court notes, additionally, that the job of surveillance system monitor – numbering 102,000 nationally, according to the vocational expert (R. 51) – requires neither stooping nor reaching. See DOT § 379.367-010.

[8] Plaintiff argues that most sedentary occupations require frequent to constant reaching, and a "complete inability to reach ordinarily significantly erodes the unskilled sedentary occupational base" and, thus, that a finding of "disabled would usually apply." (Doc. # 12, p. 9). Plaintiff also points to the definition of light work and notes that it requires the use of hands and arms to grasp, hold, and turn objects, and it requires some ability to push and pull arm-hand controls. (Id., p. 10). These arguments make little sense in the context of a step five decision rendered on the basis of vocational expert testimony as opposed to use of the "grids." In this case, in any event, these arguments are rendered moot by the court's conclusion that the ALJ's RFC determination is supported by substantial evidence and the ALJ's reliance on vocational expert's testimony to support his step five finding.

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be affirmed.  A separate judgment will be entered.

Done, this 30th day of June, 2010.


/s/ Susan Russ Walker

SUSAN RUSS WALKER

CHIEF UNITED STATES MAGISTRATE JUDGE